IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Roberta Casden, et al.,                                              Case No.: 3:06CV7068

        Plaintiffs,

        v.                                                            ORDER

Michael J. Burns, et al.,

        Defendants.


      This is a derivative suit and shareholder class action against current and former officers and

directors of Dana Corporation [Dana]. The named plaintiff, Roberta Casden, alleged several

corporate misdeeds harming the company's shareholders, including breach of fiduciary duty, abuse

of control, constructive fraud, gross mismanagement, waste of corporate assets, unjust enrichment,

and violations of the Sarbanes-Oxley Act of 2002, 28 U.S.C. § 1658.

      All derivative claims were stayed pending ongoing bankruptcy proceedings in the Southern

District of New York, leaving only Count I, a class claim for breach of fiduciary duty. Count I is

directed at all defendants, who are current and former officers of Dana and members of its Board

of Directors.

      Casden seeks various forms of relief under Count I on behalf of the class. First, she seeks

declarations that: 1) this action is properly maintained as a class action; 2) the "decision to bankrupt

Dana" was a breach of fiduciary duty of the "Current Director Defendants" and "Officer Defendants"[1]; and 3) those individuals are liable to her and the class.

Casden seeks an award of money damages. Other relief sought by Casden includes injunctive and/or other equitable relief and costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

### Background

Casden's bases her complaint on certain alleged actions occurring between April, 2000, and the filing of her suit (the "Relevant Period"). According to the complaint, Dana, to offset the rising cost of steel, attempted during the Relevant Period to cut costs. Dana and its directors, based on the cost-cutting initiative, set financial targets for its many plants. Defendants Burns and Richter received production reports from each plant at least monthly containing consolidated financial information. Burns and Richter were therefore allegedly aware that many of the plants were not meeting their budgets.

Also during the Relevant Period, Burns and Richter allegedly manipulated the earnings guidance announced to the market by inflating the earnings forecasts obtained from Dana's various

---

[1]

Casden's second amended complaint organizes defendants into four main categories: 1) "Officer Defendants" are those who were officers of Dana during the acts alleged. Included are Michael J. Burns (Chairman of the Board, President, and CEO) and Robert C. Richter (Vice President and CFO); 2) "Director Defendants" are those who were members of Dana's Board of Directors during all or some of the acts alleged, including Michael J. Burns (Chairman of the Board, President, CEO), Richard B. Priory (director), A. Charles Baillie (director), Marilyn R. Marks (director), Edmund M. Carpenter (director), James P. Kelly (director), Cheryl W. Grisé (director), Samir G. Gibara (director), David E. Berges (director), Richard M. Gabrys (director), Glen H. Hiner (former director), Benjamin F. Bailar (former director), Eric Clark (former director), and Fernando M. Senderos (former director); 3) "Current Director Defendants" include all Director Defendants, excluding former directors; and 4) the "Individual Defendants" include all the defendants mentioned above.

divisions. According to the complaint, Burns and Richter refused to accept the forecasts presented by some divisions until they were increased to meet company-wide goals. Casden alleges that the purported goal of the misleading earnings guidance was to "continue to support the Company's efforts to avoid writing down its deferred tax assets which increased by more than 75% . . . during the Relevant Period," and to avoid taking a "valuation allowance which would devastate Dana's asset base and cause a concomitant dramatic drop in Dana's credit rating and stock price."

Casden's complaint details numerous instances where one or more of the Individual Defendants issued (or allowed Dana to issue) allegedly misleading financial statements and press releases. She also asserts various ways that Dana's financial statements do not comport with Generally Accepted Accounting Principles (GAAP).

In September, 2005, Casden alleges that one or more Individual Directors issued or caused the company to issue statements that Dana was revising its earnings outlook downward. The company issued a statement in October, 2005, that it would restate various financial statements from 2004 and 2005, asserting that there were "material weaknesses in [Dana's] internal control over financial reporting." Dana eventually filed amended financial statements for the first quarter of 2000 through the first two quarters of 2005.  The Securities and Exchange Commission also initiated an investigation into potential accounting improprieties at the company.

On October 12, 2005, Casden made a demand on the Board to commence legal action on behalf of Dana against those responsible for the allegedly improper conduct. On January 25, 2006, the Board informed Casden that it had decided to reject her demand. Casden filed the present action on March 2, 2006.

Casden asserts that in early 2006, several defendants made public statements that tended to indicate Dana would not file for bankruptcy. On March 3, 2006, however, only one day after Casden filed the present suit, the Current Director Defendants and Officer Defendants "caused Dana to issue a press release" announcing that Dana had voluntarily filed for Chapter 11 reorganization.

Casden claims that Dana filed for bankruptcy "because Dana's financial statements necessitated restatements," and that the restatements "were the result of Individual Defendants' breaches of fiduciary duties owed to Dana and Dana's shareholders."

Casden argues that the alleged conduct of any of the Individual Defendants has been "ratified by the remaining Individual Defendants who collectively comprised all of Dana's Board during the Relevant Period."

Casden defines the class under Fed. R. Civ. P. 23 as "[a]ll persons or entities who owned stock at the time the Individual Defendants breached their fiduciary duties causing Dana to restate its financial statements and continued to hold stock in Dana through the Current Director Defendants and Officer Defendants' decision to bankrupt Dana," excluding the defendants and "any person, firm, trust, corporation, or other entity related to or affiliated with any defendant."

## Discussion

Three groups of defendants filed motions to dismiss Count I, the sole pending active count in plaintiff's complaint. I asked the parties to focus their briefing on whether the: 1) the class action claim is essentially derivative in nature, thereby necessitating staying it with the other derivative claims; and 2) federal bankruptcy laws preempt the state laws on which plaintiff bases her class claim. Each group of defendants makes the same basic arguments.

### 1. Derivative Nature of Claims

4

## A. Choice of Law

All defendants agree that Virginia law should determine whether Count I is a direct claim or a derivative claim, based on Ohio choice of law principles, which follow the Restatement (Second) of the Law of Conflicts. Casden fails to specify in her briefs which state's law should govern the issue. During oral argument, however, Casden acknowledged that Virginia law governed the question of whether her claim is direct or derivative.

## B. Derivative Versus Direct Claims

Defendants argue that Casden's class claim is essentially derivative in nature. Defendants posit that the standard for determining whether a claim is derivative is whether one particular group of shareholders is affected differently (i.e., worse) than others. They contend that all shareholders were affected in an identical manner by any alleged breach of fiduciary duty.

Casden denies that the claims are derivative. She claims that if the harm to shareholders is distinct from the harm to the company, then the shareholders may maintain a direct (i.e., non-derivative) claim. Defendants' original motions, on the other hand, appear to imply that any harm shared equally by all shareholders necessarily gives rise to a derivative claim.

Defendants argue that the shareholders at large cannot be worse off at the same time that the company is better off. Casden argues in response that the decision to enter bankruptcy helped the corporation but harmed the shareholders; therefore, she asserts, the harm to shareholders was distinct from any effect on the corporation. Her claim, accordingly, is, in her view, direct, not derivative.

Few cases from Virginia have facts similar to those in this case. Decisions from other jurisdictions tend, however, to view claims similar to Casden's as derivative in nature.

The decision *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 798-99 (Bankr. S.D. Tex 1993)*,* for example, presents a somewhat analogous situation. In that case, a company had filed a bankruptcy petition under Chapter 11. The Bankruptcy Court had approved a plan for reorganization. In a class action seeking to represent all public shareholders, plaintiffs argued that the directors of the debtor "forgave millions of dollars of debt owed by the directors themselves, and which provided the Directors with a greater equity interest in the reorganized company to the detriment of all public shareholders." *Id*. The court found that the action was derivative, and thus barred, because the directors' actions "consist[ed] of the type of alleged harm that involves all shareholders equally." *Id*. at 799.

In *Abbey v. Modern Africa One, LLC,* 305 B.R. 594, 607 (D.D.C. 2004), minority shareholders alleged that a majority shareholder mismanaged the company, "restricted [its] access to funding," and "caused the company to improperly file for bankruptcy." The court held that such claims of "corporate mismanagement" must be "brought on a derivative basis because no shareholder suffers a harm independent of that visited upon the corporation and the other shareholders." *Id*. "Because each shareholder is injured in proportion to his or her equity interest," said the court, "'each will be made whole if the corporation obtains compensation or restitution from the wrongdoer' through a derivative action." *Id*. (citing *Cowin v. Bresler*, 741 F.2d 410, 414 (D.C.Cir.1984)).

In *Dux Capital Management Corp. v. Chen,* 2004 WL 2472247, *6-7 (N.D. Cal.), *aff'd sub nom*., *Davis v. Yageo Corp.*, 481 F.3d 661, 674 (9th Cir.2007), plaintiffs asserted that the defendant directors "breached their fiduciary duty by choosing the bankruptcy alternative rather than some other course of action expected to provide the company and its shareholders with more value." As

6

the court of appeals, affirming the trial court in *Davis v. Yageo Corp.*, 481 F.3d 661, 674 (9th Cir.2007), noted, those claims were based not on the *filing* for bankruptcy, but the "deci[sion] to file for bankruptcy," which involved "conduct that occurred prior to bankruptcy."[2] Although neither the trial court nor the appellate court addressed the direct versus derivative issue, both courts viewed those claims as belonging to the company. *See id.* at 668 (discussing how the Bankruptcy Court assigned the pre-petition claims belonging to the company to the plaintiffs); *Dux,* 2004 WL 2472247, *6-7.

Plaintiffs cite *La Van v. United States*, 382 F.3d 1340, 1350 (Fed. Cir. 2004), as support for their argument that a breach of fiduciary duty is not derivative if it does not pass through a company to its shareholders on a pro rata basis. The message of *La Van*, which is echoed by Virginia cases, is, however, slightly different: namely, that shareholders may pursue a direct action when the harm they suffer is "separate and distinct from any harm flowing through [the company] to the [plaintiffs] as shareholders." *Id.*; *see also Simmons v. Miller*, 261 Va. 561, 573 (Va. 2001); *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (Va. 1979); *Efessiou v. Efessiou*, 41 Va. Cir. 142, 149 (Va. Cir. Ct. 1996).

Casden acknowledges that the alleged harm she will experience flows through Dana; she claims, however, that she will be worse off while the company benefits. "The corporation,"she contends, "will be better off after the reorganization," while "[t]he same clearly can not be said about the net benefits to shareholders." Doc. No. 48, Ex. A, p. 4. Specifically, Casden claims that her shares will "lose their value as a result of 'cram down' or other actions taken in bankruptcy proceedings."

---

[2]

For the same reasons, the Ninth Circuit found that the claims were not preempted by federal bankruptcy law. 481 F.3d at 678-80; *see* discussion *infra* at 15 n.9.

7

To prove that the alleged harm she suffered is distinct from that to the corporation, Casden relies on *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).But this decision is not helpful on its facts to the plaintiff: the court in *Tooley* held that the shareholder plaintiffs did not state a derivative *or* direct claim, because they had no claim at all. *Id*.[3] The plaintiff's claims were not ripe. *Id.*

Few decisions from Virginia explore the standard for distinguishing between derivative and direct claims. The court in *Simmons*, 261 Va. at 573, stated, however, that "injuries to a corporation cannot be maintained by a shareholder on an individual basis." *See also Keepe*, 220 Va. at 591 ("[A] stockholder has no standing to sue in his own right for an injury to the corporation on the ground the injury caused a depreciation in the value of his stock."). Such claims must be brought derivatively to: 1) "prevent[] a multiplicity of lawsuits by shareholders;" 2) "protect[] corporate creditors by putting the proceeds of the recovery back in the corporation;" 3) "protect[] the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit;" and 4) "adequately compensate[] the injured shareholder by increasing the value of his shares." *Simmons*, 261 Va. at 574.

Another Virginia case cited by the parties, *Efessiou*, 41 Va. Cir. at 149, held that the derivative issue is solved by finding whether  "a recovery would benefit the corporation generally and all shareholders or only an individual or a determinative group or class of individuals." Accordingly, a claim "to set aside the actions of an illegally structured Board of Directors meeting and for the award of monetary damages resulting from the illegal election of Directors, the illegal

---

[3]

The decision in *Tooley* describes, however, a standard under Delaware law by which claims should be judged derivative or direct. That standard, however, has not yet been embraced by Virginia courts.

action by Directors, and the illegal issuance of stock" was derivative. *Id.* At the same time, the court held that a personal/direct action arose from the violation of a particular shareholder's preemptive rights. *Id.*

The type of corporate misdeeds deemed to give rise to derivative claims in *Efessiou* have, moreover, more in common with those alleged in this case than do the misdeeds giving rise to a direct action for denial of preemptive rights in *Efessiou*. 41 Va. Cir. at 149.

There being, in any event, no Virginia case directly considering the distinction, as placed in issue in this case by the plaintiff, between a company and its shareholders, it is instructive to turn to the rationale, as stated in *Simmons*, for finding that an action in Virginia is derivative.

That case, as noted above, held that claims based on alleged injury to a corporation must be brought derivatively to: 1) avoid a multiplicity of shareholder lawsuits; 2) return any proceeds from the suit to the company for the benefit of its creditors; 3) increase the value of all the shares to the benefit of all shareholders; and 4) adequately compensate an injured shareholder by increasing the value of his shares. 261 Va. at 574.

All four reasons for finding claims to be derivative apply under the present facts: multiple suits will be avoided, any proceeds will go back to the corporation, all [and not just some] of the shareholders will benefit, while adequately compensating injured shareholders. Indeed, allowing claims such as that asserted by Casden in this case would endorse a multiplicity of class actions and potentially preclude returning the proceeds of the suit to the corporation for the benefit of its creditors.

### 2. Ripeness

Regardless of whether Casden's claim is direct or derivative, it is not ripe.

Shareholders may be affected positively or negatively by a Chapter 11 reorganization. Shareholders can benefit if the company emerges from bankruptcy as a stronger and more profitable financial entity. *See* Lucian A. Bebchuk et al, *Bargaining and the Division of Value in Corporate Reorganization*, in Barry E. Adler, *Foundations of Bankruptcy Law* 204-05 (2005). On the other hand, shares may indeed lose value as a direct result of "cram down" in a Chapter 11 reorganization. *See* 11 U.S.C. §1129(b)(2). In fact, it is possible for shareholders to lose the entire value of their investments through cancellation of their shares. *See*, *e.g.*, *In re Evans Products Co.*, 65 B.R. 31, 33-34 (Bankr. S.D. Fla. 1986) (approving plan for reorganization that "cancel[ed] the stock and offer[ed] nothing to the shareholders").

At the same time, however, it is also possible for shareholders to retain the exact level of ownership they had before the company filed for Chapter 11, or even to enjoy an increase in the value of their shares as a result of reorganization. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (discussing how shares of a company may still retain value during the bankruptcy process even if the entity has no "'going concern' value"). If shareholders maintain their pre-filing number of shares, and if their shares are not modified as a result of the reorganization, it follows that any loss of value in their shares flows directly from damage to the corporation; if the capital structure remains intact throughout the reorganization, then damage to the corporation and damage to the shareholders are one and the same.

Whether shareholders retain the same ownership of the debtor depends on the approval and execution of a plan for reorganization – a process that takes place in Bankruptcy Court.[4] 11 U.S.C.

---

[4]

Moreover, shareholders will be able to vote, object, and otherwise participate in the reorganization process. *See*, *e.g.*, 11 U.S.C. §§ 1126(a), 1126(c) (detailing procedure for acceptance or rejection of plan by holders of interests). Adjustments to the plan are often made prior to confirmation to

§1129. Until a plan for reorganization is approved, or at the very least until a disclosure statement has first been submitted and/or approved by the Bankruptcy Court,[5] any alleged *distinct* damage to shareholders is speculative at best.[6]

For this reason, Casden's claim would not be ripe at least until a plan for reorganization were approved in Bankruptcy Court (or a disclosure statement, depending on the information contained therein). *Brown v. Ferro Corp.*, 763 F.2d 798, 802 (6th Cir. 1985) (affirming dismissal on ripeness grounds as to claims that company leaders improperly created "golden parachutes," which had yet to be used, involved "speculat[ion] as to the future course of events"). For a claim to be ripe, it "must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury.'" *Id.* at 801 (citing *O'Shea v. Littleton*, 414 U.S. 488 493-94 (1974)).

---

satisfy the needs of the parties.

Also, shareholders have the ability to negotiate deals with senior creditors, receiving concessions from the senior creditors in exchange for a promise from shareholders not to delay or complicate the reorganization process. *See* Douglas G. Baird, *Elements of Bankruptcy* 281 (2006).

[5]

Under 11 U.S.C. § 1125(b), a debtor may not even seek approval of a plan until a disclosure statement containing "adequate information" is approved by the Bankruptcy Court "after notice and a hearing." *Id.* "Adequate information" would include data that would help shareholders project the potential impact on them of the reorganization process. 11 U.S.C. § 1125(a).

[6]

Plans for reorganization can subsequently be modified, 11 U.S.C. §1127, and I therefore make no definitive holding that this claim, even if direct, would automatically ripen upon approval of such a plan.

Furthermore, anything other than a 100% loss of value by shareholders could present additional thorny questions. In order to prove an injury, for instance, plaintiffs might be forced to show what the value of their shares would have been but for the defendants' decision to file bankruptcy.

Casden has not alleged that a plan for reorganization has been approved, and I have no independent knowledge of the approval of such plan, nor even the approval of a disclosure statement, by the Bankruptcy Court. The claim is not ripe, and the proper course of action is to dismiss rather than issue an automatic stay pursuant to 11 U.S.C. §362(a)(3).

### 3. Preemption

Defendants assert that federal bankruptcy law preempts any state law purporting to affect a company's or officer's decision to file for bankruptcy. Thus, they contend, Casden cannot, as a result of such preemption, proceed on her claim, which she bottoms on her contention that improper motives influenced their decision to seek bankruptcy protection.

Defendants also contend that, despite recent amendments to the complaint, the claim for breach of fiduciary duty still ultimately turns on defendants' decision to file the bankruptcy petition. Regardless of any reformulation of the complaint, Count I, defendants argue, still seeks to impose liability under state law for a decision (to file for bankruptcy) which is fundamentally a matter of federal law and concern.

Casden makes three primary arguments against federal preemption of the class claim. First, she argues that any preemption doctrine does not relate to claims arising during the period preceding the filing of the bankruptcy petition. Count I, she asserts, focuses on the defendants' conduct before the bankruptcy.

Second, she argues that claims against non-debtors are not preempted. Since the defendants were not debtors of the company, she argues that federal bankruptcy law does not preclude actions against them. It should be noted, however, that defendants, in their original motions to dismiss, never based their preemption arguments on any allegations that defendants were debtors.

12

Third, Casden claims that neither "field preemption" nor "conflict preemption" applies in the present circumstances.[7] She argues that field preemption does not bar her claim because she perceives no congressional intent to occupy the entire field underlying the bankruptcy laws. In addition, she claims that, in this case, allowing her direct claim against the defendants to go forward creates no risk of discouraging the filing of bankruptcy. Permitting her to recover in this case, she states, "would not discourage individuals or entities from evaluating or even recommending bankruptcy as long as they do so in a manner designed to eliminate any improperly inflicts [sic] of interest."

Casden likewise claims that "conflict preemption" also does not bar her suit. Although a direct suit cannot proceed against Dana while its bankruptcy proceedings are pending, Casden contends that allowing her class claim would not frustrate the purpose of the bankruptcy statute. This is so, in her view, because Count I does not accuse Dana, as a corporation, of any misconduct, and because, as well, the defendants are neither creditors nor debtors. Thus, she sees no incompatibility between her state law class claim and federal bankruptcy law.

---

[7]

There are three varieties, one express and two implied, of federal preemption. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562-63 (6th Cir. 1998).  Express preemption arises when Congress "expresses a clear intent to pre-empt state law in the language of the statute." *Id*.

"Field preemption," which is one variety of implied preemption, results when Congress "indicates an intent to occupy exclusively an entire field of regulation." This may occur with "a federal regulatory scheme that is 'so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it.'" *Id*. (citing *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

"Conflict preemption," which is also implied, occurs "either where it is impossible to comply with both federal and state law, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' as reflected in the language, structure and underlying goals of the federal statute at issue." *Id*.

13

The Independent Directors reply by arguing that Casden's claim unavoidably steps into territory occupied by federal bankruptcy law. To succeed on her fiduciary duty claim, they say, she will have to prove "that the bankruptcy was filed 'in bad faith or for an improper purpose.'" Any such a finding, they contend, necessarily would inhibit others from seeking the protection afforded by the bankruptcy laws, which would frustrate the protective and restorative purposes of those fundamentally important federal provisions.

The Independent Directors also cite Casden's statement that she fears her shares will fall in value during the "cram down" process of the bankruptcy proceedings. They argue, because her allegations about the effects of a "cram down," which is a potential and permissible outcome in the bankruptcy proceeding, 11 U.S.C. §1129(b)(2), constitute a "direct challenge to any plan that might be submitted to or approved by the Bankruptcy Court," her claim is necessarily preempted.

Federal courts have sometimes permitted suits based on deliberations and board actions that preceded the filing of bankruptcy despite concerns by defendants about preemption. The court in *F.D.I.C. v. Barton*, 1998 WL 169696, *2 (E.D. La.), allowed claims for alleged pre-petition breaches of fiduciary duties, including: "[p]articipating in counseling, promoting, and aiding and abetting, approving the filing of the [company's] subsidiaries' bankruptcy petitions and adversary proceedings in bankruptcy"; "[f]ailing to inform regulators of the intent to file the bankruptcy petitions and adversary proceedings in bankruptcy"; and "approving the filing of the bankruptcy petitions and adversary proceedings in bankruptcy."

The court in *Barton* concluded that cases such as *Gonzales v. Parks*, 830 F.2d 1033 (9th Cir.1987), and *In re Schepps*, 160 B.R. 792 (Bankr.S.D.Tex.1993), created a distinction between *post-petition* actions by defendants, which are preempted, and pre-petition conduct. 1998 WL

14

169696, *3-4. Because the defendants' actions in *Barton*, including their "approving the filing of the bankruptcy petitions," occurred pre-petition, preemption did not bar plaintiffs' claims in that case. *Id*.[8]

An important distinction exists, however, between Casden's claims and those that have not been preempted: her claim will not accrue until her "expectancy of harm is converted into actual injury." *Dux Capital Mgmt. v. Chen*, 2004 WL 1936309, *18 (N.D. Cal.), *aff'd sub nom. Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007); *see also Kunz v. Buckeye Union Ins. Co.*, 1 Ohio St. 3d 79, 81-82 (1982) (finding tort cause of action accrued as of date that damages were incurred, and not earlier date when duty was breached).[9] The court in *Barton* did not, in any event, discuss when plaintiff's claim for breach of fiduciary duties or damages accrued.

---

[8]

The court in *Barton* did not discuss when plaintiff's claim for breach of fiduciary duties or damages accrued. What matters in this case is that the claim might only accrue after filing of the petition, not before, if it ever does accrue.

[9]

*Dux* involved allegations of improper actions by board members who voted to take the company into bankruptcy without sufficiently exploring alternatives. 2004 WL 1936309, *1-2. The harm alleged in that case was not the possibility of cram down, as plaintiff fears here, but the decrease in share value between the vote to file for bankruptcy and actual filing of the petition.

To the extent that Casden formulates her claim for damages in a similar manner, her claim is even even more clearly derivative. Doc. No. 34, pp. 1-2. While the value of Dana stock may have decreased following the alleged wrongdoings of the Individual Defendants based on expectations of whether and how cram-down will effect equity-holders, that harm is shared in equal measure by the corporation at large – which remains true even if one is inclined to believe that cram down could enable a direct suit at a later time.

In *Dux*, moreover, the Bankruptcy Court had already approved the assignment of the all the company's "pre-bankruptcy" claims to the plaintiff shareholder, thus blessing the suit and negating the possibility of intruding upon the territory of the bankruptcy process. 2004 WL 1936309, *18-19. No Bankruptcy Court issued a similar order in this case.

15

When, as here, injury to shareholders might never occur, and thus plaintiff's claim would not accrue, if at all, until after the company files its bankruptcy petition, and accrual of the claim depends on what happens in the Bankruptcy Court, the potential future claim would interfere sufficiently with the bankruptcy process to trigger preemption. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000) ("'It is very unlikely that Congress intended to permit the superimposition of state remedies on the many activities that might be undertaken in the management of the bankruptcy process.'") (citing *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996)).

Allowing Casden's state law-based class claim to proceed in this circumstance would invite a multiplicity of similar suits. As noted in *Pertuso*, "[p]ermitting assertion of a host of state law causes of action to redress wrongs under the Bankruptcy Code would undermine the uniformity the Code endeavors to preserve and would 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 426 (citing *Bibbo*, 151 F.3d at 562-63).

Moreover, a nexus exists between plaintiff's claim and sanctions available for improper filing of a bankruptcy proceeding. Those filing for bankruptcy must do so in good faith, and Bankruptcy Courts may penalize bad faith filings. *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304, 1310-12 (2d Cir. 1997); *Matter of Washtenaw/Huron Inv. Corp. No. 8*, 160 B.R. 74, 77 (E.D. Mich. 1993) (noting that the test for good faith "'requires consideration of the totality of circumstances.'") (citing *In re Barrett*, 964 F.2d 588, 591 (6th Cir.1992)).

Because it is distinctly the province of bankruptcy law to determine liability for improper actions relating to bankruptcy filings, Casden's claim is preempted. As noted by the Ninth Circuit, rejecting plaintiffs' state law claim for abuse of process on the basis of preemption in *Gonzales v.*

16

*Parks*, 830 F.2d 1033, 1036 (9th Cir. 1987), "Congress' authorization of certain sanctions for the filing of frivolous bankruptcy petitions should be read as an implicit rejection of other penalties."

While at least one other circuit has been hesitant to deem such state law claims preempted, *see U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 393 (3d Cir. 2002) (disagreeing with *Gonzales*), I agree with the observation in *Gonzales* that "the mere possibility of being sued in tort" could "deter persons from exercising their rights in bankruptcy" and that, ultimately, it is the job of "Congress and the federal courts . . . to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized." 830 F.2d at 1036.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT defendants' motions to dismiss be, and the same are hereby granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

17